IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

**MARY E. JOHNSON,**
        **Plaintiff,**

**v.**                                         **CASE NO. 2:13-cv-07797**
**CAROLYN W. COLVIN,**
        **Acting Commissioner of Social Security,**

        **Defendant.**

## MEMORANDUM OPINION

This is an action seeking review of the final decision of the Commissioner of Social Security denying the Claimant's application for disability insurance benefits (DIB) and supplemental security income (SSI), under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f.   Both parties have consented to a decision by the United States Magistrate Judge.   Presently pending before the Court are Claimant's Brief in Support of Judgment on the Pleadings (ECF No. 13) and Defendant's Brief in Support of the Defendant's Decision (ECF No. 14).

Background

On March 29, 2010, Claimant, Mary E. Johnson, protectively filed applications for disability insurance benefits and supplemental security income payments alleging disability onset beginning January 15, 2004[1].   The claims were denied initially on September 23, 2010, and upon reconsideration on May 5, 2011.   Claimant then filed a written request for a hearing before an administrative law judge (ALJ).   A hearing was held on March 12, 2012, in Charleston, West Virginia.   The ALJ denied the claims on March 27, 2012 (Tr. at 26-40). Claimant requested a

---

[1] Claimant's application states "I am unable to work because of my disabling condition on January 15, 2004" (Tr. at 183).

review of the hearing decision, which the Appeals Council denied.  Claimant brought the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g).

Under 42 U.S.C. § 423(d)(5) and § 1382c(a)(3)(H)(i), a claimant for disability benefits has the burden of proving a disability.  *See Blalock v. Richardson*, 483 F.2d 773, 774 (4th Cir. 1972).  A disability is defined as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . can be expected to last for a continuous period of not less than 12 months . . . ."  42 U.S.C. § 1382c(a)(3)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims.  20 C.F.R. § 416.920 (2013).  If an individual is found "not disabled" at any step, further inquiry is unnecessary.  *Id.* § 416.920(a).  The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment.  *Id.* § 416.920(b).  If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment.  *Id.* § 416.920(c).  If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4.  *Id.* § 416.920(d).  If it does, the claimant is found disabled and awarded benefits.  *Id.*  If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work.  *Id.* § 416.920(e).  By satisfying inquiry four, the claimant establishes a prima facie case of disability.  *Hall v. Harris*, 658 F.2d 260, 264 (4th Cir. 1981). The burden then shifts to the Commissioner, *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience.  20 C.F.R. § 416.920(f) (2013).  The Commissioner must show two things: (1) that the claimant, considering claimant's

age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job and (2) that this specific job exists in the national economy. *McLamore v. Weinberger*, 538 F.2d 572, 574 (4th Cir. 1976).

In this particular case, Claimant's date of last health insurance coverage was June 30, 2008. For purposes of Title II, evidence beginning on the alleged disability onset date, January 15, 2004, up to the date Claimant was last insured must be reviewed.  For purposes of Title XVI SSI, evidence from the alleged onset date of disability, January 15, 2004, up to the date of the hearing decision, March 27, 2012, must be reviewed[2].  Under the sequential evaluation, the ALJ determined that Claimant satisfied the first inquiry because she has not engaged in substantial gainful activity during the period from her alleged onset date of January 15, 2004 (Tr. at 28). Under the second inquiry, the ALJ found that Claimant suffers from the severe impairments of personality disorder, anxiety and depressive disorder not otherwise specified (Tr. at 29).  At the third inquiry, the ALJ concluded that Claimant's impairments do not meet or equal the level of severity of any listing in Appendix 1.  The ALJ then found that Claimant has a residual functional capacity to perform a full range of work at all exertional levels, reduced by nonexertional limitations (Tr. at 32).   Transferability of job skills is not an issue because Claimant does not have past relevant work (Tr. at 38).  The ALJ concluded that Claimant could perform jobs such as cleaner/janitor and housekeeper. (*Id.*)  On this basis, benefits were denied (Tr. at 39).

---

[2] Because disability insurance benefits (DIB) are based upon a federally insured program, a claimant must prove that she became disabled on or before her insured status expires.  42 U.S.C. § 423(a)(1)(A), (c)(1); 20 C.F.R. §§ 404.130, 404.131(a), 404.315(a)(1).  There is no such requirement for a supplemental security income (SSI) claim because that program is based upon financial need.

Scope of Review

The sole issue before this court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence.  In *Blalock v. Richardson*, substantial evidence was defined as:

> "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'"

*Blalock v. Richardson*, 483 F.2d 773, 776 (4th Cir. 1972) (quoting *Laws v. Cellebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)).  Additionally, the Commissioner, not the court, is charged with resolving conflicts in the evidence.  *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Nevertheless, the courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational."  *Oppenheim v. Finch*, 495 F.2d 396, 397 (4th Cir. 1974).

A careful review of the record reveals the decision of the Commissioner is not supported by substantial evidence.

Claimant's Background

Claimant was born on May 16, 1978.  At the time of the hearing, she was 33 years old (Tr. at 59).    Claimant finished the ninth grade.  Claimant has been receiving mental health treatment since she was 19 years old (Tr. at 69).  Claimant previously worked as a cashier (Tr. at 60).  On July 29, 2008, Claimant filed applications alleging disability starting January 15, 2004. Claimant's disability applications were denied.

<u>The Medical Record</u>

The Court has reviewed all evidence of record, including the medical record, and will discuss it further below as necessary.

<u>Claimant's Challenges to the Commissioner's Decision</u>

Claimant asserts that the ALJ's decision is not based on substantial evidence because the ALJ failed to accord adequate weight to the opinions of Sheila Kelley, M.A., and E.M. Robie M.D..  Claimant asserts the ALJ failed to give her and her husband's testimony appropriate credibility weight (ECF No. 13).  The Commissioner asserts that substantial evidence supports the ALJ's decision that Claimant had the residual functional capacity for a range of routine, repetitive work tasks at all levels of exertion (ECF No. 14).  The Commissioner asserts the ALJ's findings in regard to Claimant's credibility concerning limitations from her depression, anxiety disorder and personality disorder, were supported by substantial evidence.

<u>Medical Background</u>

Claimant was admitted to the Psychiatric Unit at Thomas Memorial Hospital on April 4, 2001, after expressing thoughts of suicide (Tr. at 318-319).  Claimant stated that "her mind was racing in all different ways" and that "she felt like she possibly could hurt herself."  (*Id.*)  A suicide risk assessment was conducted and reported that Claimant has a history of suicide attempt and was at risk for suicide (Tr. at 321).  Claimant's assessment summary reflects that she was under the care of John Justice, M.D., for depression[3] (Tr. at 326).

---

[3] Claimant testified at the hearing to being treated by Dr. Justice at Thomas Memorial Hospital (Tr. at 69).

On July 25, 2004, Claimant was seen at Charleston Area Medical Center Emergency Department for attempted suicide by slitting her wrist (Tr. at 349-356, 537-538). Claimant's drug screen tested positive for benzo, for which she has a prescription, and THC (Tr. at 538). Attending physician Piayon E. Kobbah, M.D., reported that Claimant "has a history of depression and anxiety" (Tr. at 537). Dr. Kobbah reported that Claimant "did this in a suicide gesture." (*Id.*) Upon psychiatric review, it was reported that Claimant "is depressed and has attempted suicide by slashing her wrists." (*Id.*) Claimant's wrist was sutured and she was discharged on July 26, 2004. Claimant reported back to Charleston Are Medical Center to have her sutures removed on August 2, 2004 (Tr. at 536). A copy of the medical record was provided to Dennis M. Cupit, M.D. (*Id.*)

Claimant reported back to Charleston Area Medical Center Emergency Department on May 18, 2005, with complaints of right hand and right arm pain (Tr. at 534-535). Claimant asked for a referral to a family physician and some pain medication (Tr. at 534).

On August 23, 2010, Ernie Vecchio, M.A., performed a Disability Determination Evaluation for the West Virginia Disability Determination Service (Tr. at 370-376). Claimant was 32 years old on the date of the examination. Mr. Vecchio reports that Claimant was cooperative throughout the exam but cried often (Tr. at 372). Her mood was anxious and depressed. Her affect was reported as tearful. Claimant's insight was poor. Her judgment was within normal limits. Claimant admitted to suicidal ideation (Tr. at 373). Mr. Vecchio diagnosed Claimant with major depressive disorder that was recurrent and moderate; anxiety disorder; and personality disorder. (*Id.*) Mr. Vecchio's prognosis of Claimant was poor (Tr. at 374). Mr. Vecchio reported that Claimant was "marginally capable of managing her finances." (*Id.*)

6

On September 18, 2010, James Binder, M.D., performed a Psychiatric Review of Claimant from January 15, 2004, to June 30, 2008, the date last insured (Tr. at 377). Dr. Binder found there was insufficient evidence to determine Claimant's medical disposition. Dr. Binder did not select or comment on any of the factors listed for discussion of psychiatric disorders covering ten (10) pages of the psychiatric review (Tr. at 378-389).

Additionally, on September 18, 2010, Dr. Binder completed a second Psychiatric Review of Claimant from Claimant's application date, March 29, 2010, to September 18, 2010 (Tr. at 392). Dr. Binder reported that a residual functional capacity assessment (hereinafter RFC) was necessary to determine Claimant's medical disposition. (*Id.*) However, Dr. Binder continued to report that his review of Claimant's medical disposition was based upon the categories of Listings 12.04 Affective Disorders, 12.06 Anxiety-Related Disorders and 12.08 Personality Disorders. Dr. Binder reported that medically determinable impairments were present that did not precisely satisfy the diagnostic criteria for depression, anxiety and personality disorder (Tr. at 393-404). Dr. Binder rated Claimant's degree of functional limitations as mild in restrictions of activities of daily living and difficulties in maintaining concentration, persistence or pace (Tr. at 402). He rated Claimant to have moderate limitations in difficulties in maintaining social functioning. He found that Claimant had not experienced any episodes of decompensation.[4]

Dr. Binder's consultant notes on the Psychiatric Review from March 29, 2010, to September 18, 2010, list the records he reviewed in performing his review (Tr. at 404). Dr. Binder reports that he reviewed emergency room records from Charleston Area Medical Center

---

[4] Although Dr. Binder found that Claimant had not experienced any episodes of decompensation, Claimant had cut her wrist on July 25, 2004 (Tr. at 349). Charleston Area Medical Center Emergency Department records reflect that Claimant "became very depressed and she took a butcher knife in the kitchen and slit the flexor surface of her wrist" (Tr. at 537). Evidence in the record reflects the Emergency Room examination for her slit wrist was on July 25, 2004, instead of June 25, 2004, as repeatedly stated throughout the transcript.

(hereinafter CAMC) beginning July 25, 2001, however, there are no records from CAMC in 2001.  The records from CAMC are dated from July 25, 2004, to August 2, 2004 (Tr. at 349-356), and from June 17, 2003, to March 9, 2006 (Tr. at 529-545).

Additionally, Dr. Binder's consultant notes on the Psychiatric Review from March 29, 2010, to September 18, 2010, indicated that he reviewed Thomas Memorial Hospital records from December 15, 2002, to September 18, 2010; Nitro Primary Care records from March 11, 2010, to September 18, 2010[5]; and the Mental Status Examination by Dr. Vechhio dated August 23, 2010 (Tr. at 404).    Dr. Binder reported that Claimant has anxiety, depression and a personality disorder.  He reported that a Mental Residual Functional Capacity assessment is needed.  He stated that Claimant is partially credible.  He found that her claims of impaired understanding were not fully supported by her Mental Status Examination.

Dr. Binder completed a Mental Residual Functional Capacity Assessment of Claimant on September 18, 2010, and concluded that she was not significantly limited in understanding and memory; sustained concentration and persistence; adaptation; the ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness; and the ability to ask simple questions or request assistance (Tr. at 406-407).  Dr. Binder found Claimant to be moderately limited in the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; the ability to interact appropriately with the general public; the ability to accept instructions and respond appropriately to criticism from supervisors; and the ability to get along with coworkers or peers without distracting them or

---

[5] Although Dr. Binder only reviewed Nitro Primary Care Clinic's records from March 11, 2010, to September 18, 2010, records from Nitro Primary Care Clinic were entered into evidence from February 26, 2008, to October 1, 2010 (Tr. at 410-466).

exhibiting behavioral extremes (Tr. at 407).   Dr. Binder's Functional Capacity Assessment reported that "Claimant likely would have the above limitations but be capable of learning and performing basic work-like tasks" (Tr. at 408).

Dr. Binder performed two Psychiatric Reviews of Claimant on September 18, 2010.  He did not include the time frame from July 1, 2008, to March 28, 2010, in either of the Psychiatric Reviews.  Claimant saw her treating physician, E.M. Robie, DO, at Nitro Primary Care during this time.  Dr. Robie's Summary Reports for treatment of Claimant reflect under the vital signs section that Claimant was seen during the time frame on July 25, 2008, August 25, 2008, November 25, 2008, February 25, 2009, May 7, 2009 and March 11, 2010 (Tr. at 411-412).

Claimant stopped attending mental health counseling when her therapist, Tad Vickers, retired.  She then began receiving treatment from Dr. Robie, her treating physician. The medical evidence of record reflects that Claimant was treated by Dr. Robie at Nitro Primary Care Clinic from approximately January 11, 2008, to February 2012 (Tr. at 410-466, 547-562, 543-545).

Paula J. Bickham, Ph.D., performed a Mental Residual Functional Capacity Assessment of Claimant on January 10, 2011 (Tr. at 467-472).  Dr. Bickham's case analysis stated that she had reviewed all the evidence in the file and affirmed Dr. Binder's Psychiatric Review on September 18, 2010 (Tr. at 467).  Dr. Bickham's assessment concluded that Claimant was not markedly limited in understanding and memory; sustained concentration and persistence; social interaction; and adaptation (Tr. at 469-470).  Dr. Bickham's functional capacity assessment stated that Claimant retains the ability to learn and perform repetitive work-like activity with minimal contact with others (Tr. at 471).

Additionally, Dr. Bickham performed a Psychiatric Review of Claimant on January 10, 2011 (Tr. at 473-486). She found there was insufficient evidence to determine Claimant's medical disposition (Tr. at 437). Dr. Bickham reported that her review of Claimant's medical disposition was based upon the categories of Listing 12.04 Affective Disorders, 12.06 Anxiety-Related Disorders and 12.08 Personality Disorders (Tr. at 476, 478, 480). Dr. Bickham reported that medically determinable impairments were present that did not precisely satisfy the diagnostic criteria for depression, anxiety and personality disorder. She rated Claimant's degree of functional limitation as mild in restriction of activities of daily living (Tr. at 483). She found Claimant's degree of functional limitations as moderate in difficulties in maintaining social functioning and difficulties in maintaining concentration, persistence or pace. Dr. Bickham found that Claimant did not experience any episodes of decompensation. (Id.)

Dr. Bickham's consultant notes on the Psychiatric Review from March 29, 2010, to January 10, 2011, list the records she reviewed (Tr. at 485). Dr. Bickham reports that she reviewed emergency room records from Charleston Area Medical Center (hereinafter CAMC) beginning July 25, 2001, however, there are no records from CAMC in 2001. The evidence contains records from CAMC from July 25, 2004, to August 2, 2004 (Tr. at 349-356), and from June 17, 2003, to March 9, 2006 (Tr. at 529-545). She reports that she reviewed records from Thomas Memorial Hospital from December 15, 2002, to January 10, 2011; Nitro Primary Care from March 11, 2010, to January 10, 2011; and the Mental Status Examination conducted on August 23, 2010, by Mr. Vecchio. Claimant's symptoms included statements of feeling anxious, nervous and scared. Claimant reported that she cuts her arms and puts cigarettes out on her arms (Tr. at 485). Dr. Bickham found Claimant to be partially credible. Dr. Bickham did not state her opinion as to Claimant's ability to work.

10

On July 1, 2011, Sheila Emerson Kelly, MA, conducted a Psychological Evaluation (Tr. at 505-514).   Ms. Kelly interviewed Claimant, reviewed her medical records, performed a Mental Status Examination, performed a Wide Range Achievement Test-4 (WRAT-4) and performed a Wechsler Adult Intelligence Scale-IV (WAIS-IV).   Claimant reported that she last worked seven (7) years ago as a cashier. She stated that she had "a nervous breakdown and ended up in Thomas [Memorial Hospital], crying and wanting to kill myself" (Tr. at 505). Claimant's background information reports that she was treated by a physician's assistant, Tad Vickers, for years until he retired (Tr. at 506).   Following Mr. Vickers' retirement, Claimant has been treated by her primary physician, Dr. Robie, at Nitro Primary Care Clinic.   Ms. Kelly states that Claimant's medical records do not reflect diagnosis of neuropathy, scoliosis or carpal tunnel syndrome even though Claimant reported to taking prescriptions as treatment.   Ms. Kelly's Psychological Evaluation noted that Claimant was extremely avoidant, and appeared to be of limited ability (Tr. at 507).   Ms. Kelly noted that Claimant is very miserable, needy and unintentionally manipulative.

Ms. Kelly reported that "It's hard to tell how much of [Claimant's] recollection of her history is accurate" (Tr. at 506-507).     Ms. Kelly stated that Claimant cried frequently throughout the interview (Tr. at 510).   She reported that Claimant was "on relatively massive doses of tranquilizing medications for reasons that seem rather unclear."   (*Id.*)   Ms. Kelly reported that a few months prior to the July 1, 2011, Psychological Evaluation, Claimant threatened to stick a knife into her own stomach.   Ms. Kelly did not believe Claimant was a legitimate threat of suicide "unless some cataclysmic event occurs such as her husband leaving her." (*Id.*)

On the Mental Status Examination, Claimant obtained a score of 28 out of 30 (Tr. at 510).   On the WAIS-IV, Claimant received the following composite scores:   Verbal Comprehension Index of 76, Perceptual Reasoning Index of 58, Working Memory Index of 66, Processing Speed Index of 79 and Full Scale IQ of 64 (Tr. at 511).   Verbal comprehension and processing speed indexes were 76 and 79 respectively.   Her GAF was noted to be between 40 and 50. Ms. Kelly reported that the combination of the four composite scores yields a Full Scale IQ that falls within the mild range of mental retardation.   (*Id.*)   Ms. Kelly reported that Claimant's composite scores were "slightly inconsistent" with the scores on the Mental Status Examination.  Ms. Kelly stated that "It's impossible to say at this point how much her perceptual reasoning and working memory are impaired by the medications she is currently taking."  On the WRAT-4, Claimant obtained a standard score of 73 in word reading and 80 in math computation. Ms. Kelly stated that Claimant's "academic abilities fall at the fourth to fifth grade level" which would be consistent with the Verbal Comprehension Index Composite Score of 76 obtained on the WAIS-IV (Tr. at 512).   Diagnosis included social phobia, generalized anxiety disorder, depressive disorder, personality disorder and mental retardation.

Additionally, Ms. Kelly completed a Medical Source Statement of Ability to do Work-Related Activities (Mental) on July 1, 2011 (Tr. at 515-517).  She found Claimant's ability to perform the following work-related mental activities as poor:  understand and remember detailed instructions; carry out detailed instructions; complete a normal workday or workweek; perform at a consistent pace; and set realistic goals or make plans independently of others. Ms. Kelly reported that Claimant was able to manage benefits in her own interest (Tr. at 517).

On February 2, 2012, Claimant's treating physician, Dr. Robie, completed a questionnaire from Claimant's attorney regarding his treatment of Claimant since  January 11,

12

2008 (Tr. at 543-545).  Dr. Robie reported that Claimant has the following medical conditions: anxiety disorder, recurrent major depression, neuropathy, bipolar-condition, social phobia, chronic low back pain, migraine headaches every few months lasting 1-2 days and obesity (Tr. at 543).  Dr. Robie reported Claimant to be credible.  Dr. Robie reviewed Ms. Kelly's Psychological Evaluation of July 1, 2011, and stated that he agreed with Ms. Kelly's assessment based upon his own treatment and observations of Claimant (Tr. at 545).

Ms. Kelly performed an Update of Psychological Evaluation on March 2, 2012 (Tr. at 602-611).  Ms. Kelly reported that Claimant remained unchanged since July 2011 (Tr. at 603).  Ms. Kelly reported that Claimant was "extremely dependent and avoidant."  Ms. Kelly found under Mental Status Examination that Claimant "is highly unlikely to respond to either psychotherapeutic or medication types of treatment as her primary psychiatric issue is her Personality Disorder and accompanying anxiety" (Tr. at 605).  Ms. Kelly reported that Claimant "is of below average intellectual ability and her poor impulse control and poor reasoning abilities affect her interactions with others.  Her moods are erratic, her temper explosive, and she is to some degree unpredictable" (Tr. at 607).  Ms. Kelly noted that Claimant was only showering approximately every three days, at the urging of her husband.  Ms. Kelly noted that Claimant "remains dysfunctional, unwilling to leave her home unless accompanied by her husband or her husband's stepfather."  Ms. Kelly discussed Claimant's Full Scale IQ score obtained in July 2011 which fell within the mild range of mental retardation.  Ms. Kelly opined that "I believe that this score is reasonably accurate." (*Id.*)

On March 2, 2012, Ms. Kelly found that Claimant had more restrictions than when previously examined.  Over half the time, she could not do detailed work, maintain regular attendance, complete a normal workday or workweek, or perform at a consistent pace.  Likewise,

over half the time, she could not accept instruction or respond appropriately to criticism from supervisors.  Ms. Kelly reported that Claimant is "probably not competent to manage her own financial affairs due to her poor judgment and impulsiveness" (Tr. at 607).  Ms. Kelly's diagnostic impression included depressive disorder, probable social phobia, generalized anxiety disorder, personality disorder, mild mental retardation, poor literacy and poor literacy.  (*Id.*)

Treating Physician Analysis

In evaluating the opinions of treating sources, the ALJ generally must give more weight to the opinion of a treating physician because the physician is often most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability.  *See* 20 C.F.R. § 404.1527(d)(2) (2013). Nevertheless, a treating physician's opinion is afforded "controlling weight only if two conditions are met: (1) that it is supported by clinical and laboratory diagnostic techniques and (2) that it is not inconsistent with other substantial evidence*." Ward v. Chater*, 924 F. Supp. 53, 55 (W.D. Va. 1996); *see also*, 20 C.F.R. § 404.1527(d)(2) (2013). The opinion of a treating physician must be weighed against the record as a whole when determining eligibility for benefits.  20 C.F.R. §§ 404.1527(d)(2) (2013).  Ultimately, it is the responsibility of the Commissioner, not the court to review the case, make findings of fact and resolve conflicts of evidence.  *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990).  As noted above, however, the court must not abdicate its duty to scrutinize the record as a whole to determine whether the ALJ's conclusions are rational.  *Oppenheim v. Finch*, 495 F.2d 396, 397 (4th Cir. 1994).

If the ALJ determines that a treating physician's opinion should not be afforded controlling weight, the ALJ must then analyze and weigh all the evidence of record, taking into account the factors listed in 20 C.F.R. § 404.1527.  These factors include: (1) Length of the

treatment relationship and frequency of evaluation, (2) Nature and extent of the treatment relationship, (3) Supportability, (4) Consistency, (5) Specialization and (6) various other factors. Additionally, the regulations state that the ALJ "will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion." *Id.* § 404.1527(d)(2).

The Court cannot conclude from the ALJ's decision that substantial evidence supports the determination that Claimant is not disabled. Claimant filed applications on March 29, 2010, alleging disability onset of January 15, 2004. Claimant's applications were initially denied on September 23, 2010 (Tr. at 113-124). In the initial denial for DIB, Defendant considered the following evidence in evaluating her claim: Nitro Primary Care Clinic report received April 6, 2010; Prestera Center East report received April 12, 2012; Huntington Behavioral Health Association Inc. report received April 7, 2010; Thomas Memorial Hospital report received April 27, 2010; and report by Ernie Vecchio, MA, received August 23, 2010 (Tr. at 118). The DIB denial letter states the following:

> You said you were disabled because of bipolar, social anxiety disorder and anxiety. You may have experienced problems with bipolar, social anxiety disorder and anxiety, however, there is insufficient evidence available prior to 06/30/2008, the date you were last insured for disability benefits, to determine your claim. Therefore, you cannot be found disabled on or before 06/30/2008.

On November 4, 2010, Claimant filed a request for consideration (Tr. at 125-126). By letter dated May 5, 2011, Claimant's request for consideration was denied (Tr. at 127). The letter stated that in addition to the medical evidence already in file, evidence from the following sources was used to reconsider her claim: Nitro Primary Care Clinic report received November 9, 2010; document copied from Gene L. Duncan, DO; and document copied from Huntington Behavioral Health Association, Inc. (Tr. at 127, 131). The letter stated:

Our prior decision stated that there was insufficient evidence available prior to 06/30/2008, the date you were last insured for disability benefits, to determine your claim.  After careful review, we have concluded that this decision is correct.

Claimant requested a hearing before an Administrative Law Judge (hereinafter ALJ).  A hearing was held on March 12, 2012.  Subsequently, the ALJ denied Claimant's applications on March 27, 2012 (Tr. at 23-45).  Claimant filed a request for review of the ALJ's decision on April 25, 2012 (Tr. at 16-22).   On October 15, 2012, Claimant mailed a second request for review (Tr. at 9).  By letter dated November 20, 2012, Defendant notified Claimant of receipt of her request for review of the ALJ's decision (Tr. at 6). The letter notified Claimant of a large volume of requests for review which may cause some delay before the Appeals Council acts in her case.  Almost a year after the hearing, on February 12, 2013, the Appeals Counsel denied Claimant's request for review (Tr. at 1-3).

Discussion

When evaluating a claimant's mental impairments, the Social Security Administration uses a special sequential analysis outlined at 20 C.F.R. §§ 404.1520a and 416.920a. First, symptoms, signs, and laboratory findings are evaluated to determine whether a claimant has a medically determinable mental impairment.  §§  404.1520a(b)(1)  and  416.920a(b)(1)(2013). Second, if the ALJ determines that an impairment(s) exists, the ALJ must specify in his/her decision the symptoms, signs, and laboratory findings that substantiate the presence of the impairment(s).  §§ 404.1520a(b)(1) and (e), 416.920a(b)(1) and (e)(2013).  Third, the ALJ then must rate the degree of functional limitation resulting from the impairment(s).  §§ 404.1520a(b)(2) and 416.920a(b)(2)(2013).  Functional limitation is rated with respect to four broad areas (activities of daily living; social functioning; concentration, persistence or pace; and episodes of decompensation).  §§ 404.1520a(c)(3) and 416.920a(c)(3) (2013).  The first three

16

areas are rated on a five-point scale: None, mild, moderate, marked, and extreme.  The fourth area is rated on a four-point scale: None, one or two, three, four or more. §§ 404.1520a(c)(4) and 416.920a(c)(4) (2013).  A rating of "none" or "mild" in the first three areas, and a rating of "none" in the fourth area will generally lead to a conclusion that the mental impairment is not "severe," unless the evidence indicates otherwise.  §§ 404.1520a(d)(1) and 416.920a(d)(1) (2013).  Fourth, if a mental impairment is "severe," the ALJ will determine if it meets or is equivalent in severity to a mental disorder listed in Appendix 1. §§ 404.1520a(d)(2) and 416.920a(d)(2) (2013).  Fifth, if a mental impairment is "severe" but does not meet the criteria in the Listings, the ALJ will assess the claimant's residual functional capacity.   §§  404.1520a(d)(3)  and  416.920a(d)(3) (2013).  The ALJ incorporates the findings derived from the analysis in the ALJ's decision:

> The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s).   The decision must include a specific finding as to the degree of limitation in each of the functional areas described  in paragraph (c) of this section.

§§ 404.1520a(e)(2) and 416.920a(e)(2) (2013).

In evaluating the opinions of treating sources, the Commissioner generally must give more weight to the opinion of a treating physician because the physician is often most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability.  See 20 C.F.R. §§ 404.1527(d)(2) and 416.927(d)(2) (2013).   Nevertheless, a treating physician's opinion is afforded "controlling weight only if two conditions are met: (1) that it is supported by clinical and laboratory diagnostic techniques and (2) that it is not inconsistent with other substantial evidence."  *Ward v. Chater*, 924 F. Supp. 53, 55 (W.D. Va. 1996); *see also*, 20 C.F.R. §§ 404.1527(d)(2) and 416.927(d)(2) (2013).  The opinion of a treating physician must be weighed

against the record as a whole when determining eligibility for benefits.   20 C.F.R. §§ 404.1527(d)(2) and 416.927(d)(2) (2013).   Ultimately, it is the responsibility of the Commissioner, not the court to review the case, make findings of fact, and resolve conflicts of evidence.   *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990).   As noted *supra*, the court must not abdicate its duty to scrutinize the record as a whole to determine whether the Commissioner's conclusions are rational.   *Oppenheim v. Finch*, 495 F.2d 396, 397 (4th Cir. 1994).

SSR 85-15 provides that the mental demands of competitive, remunerative, unskilled work includes the ability on a sustained basis to understand, carry out and remember simple instructions, respond appropriately to supervision, coworkers and unusual work situations, and deal with changes in a routine work setting.   In Ms. Kelly's evaluations dated July 1, 2011, and March 2, 2012, she indicated Claimant would not be able to remember and carry out simple instructions up to 50% of the time (Tr. at 515, 609).   Claimant would have similar restrictions in making simple work-related decisions, getting along with coworkers and peers and responding appropriately to changes in the work setting.   Additionally, Dr. Robie, Claimant's treating general physician since 2008, noted that he agreed with Ms. Kelly's assessment of July 1, 2011. Dr. Robie agreed that Claimant is paranoid and has daily crying spells.   Further, he agreed that Claimant would have trouble completing tasks.

In her decision, the ALJ found that Claimant has the severe impairments of major depressive disorder, recurrent, moderate; anxiety disorder, NOS; and personality disorder, NOS (Tr. at 29).   The ALJ held that "These impairments are established by the medical evidence and are 'severe' within the meaning of the Regulations because they cause significant limitation in the claimant's ability to perform basic work activities."   (*Id.*)   In evaluating the four broad areas of functioning, the ALJ concluded that Claimant had mild limitation in activities of daily living

18

(Tr. at 31).   The ALJ found that Claimant had moderate limitation in social functioning and concentration, persistence and pace.  (*Id.*)  The ALJ found that Claimant experienced "one to two episodes of decompensation, each of extended duration.  The record shows the claimant was hospitalized in July 2004 for suicidal ideation."  (*Id.*)

The ALJ's decision stated that "After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment" (Tr. at 34).

The ALJ did not consider Claimant's testimony describing her daily activities as fairly limited to be strong evidence in favor of finding Claimant disabled because the "allegedly limited daily activities cannot be objectively verified with any reasonable degree of certainty" and "even if the claimant's daily activities are truly as limited as alleged, it is difficult to attribute that degree of limitation to the claimant's medical condition, as opposed to other reasons" (Tr. at 35).   The ALJ states that although Claimant reported she was treated by Huntington Behavioral Health Association, an attempt to obtain medical evidence "was unsuccessful as the facility indicated they had no records for the claimant" (Tr. at 36).   In filing her disability applications, Claimant reported that she was treated by Huntington <u>Mental</u> Health Association (Tr. at 261).   It appears that the ALJ requested records from Huntington Behavioral Health Association instead of Huntington Mental Health Association (Tr. at 366-368).[6]

---

[6]  Huntington Behavioral Health Association and Huntington Mental Health Association are both located on 6th Avenue in Huntington, West Virginia (Tr. at 367).

Claimant was treated by Tad Vickers at Prestera Mental Health until his retirement. The ALJ stated that Claimant was treated by Dr. Robie of Nitro Primary Care since February 2008 "for her mental problems" (Tr. at 33). The ALJ found that "The claimant has not generally received the type of medical treatment one would expect for a totally disabled individual as she has not sought or received treatment from a mental health specialist since 2004 with the exception of three visits in 2007 with Process Strategies, which indicated that the claimant missed appointments. Otherwise, treatment has been rendered by a general practitioner" (Tr. at 35).

In discussing Claimant's March 2012 Psychological Evaluation with Ms. Kelly, the ALJ only included the portions which bolstered the ALJ's determination that Claimant's allegations were not fully credible (Tr. at 36). The ALJ did not discuss Ms. Kelly's diagnosis, Mental Status Examination or Residual Functional Capacity assessment.

Upon discussing the July 2011 and March 2012 Psychiatric Evaluations by Ms. Kelly, the ALJ gave little weight to the opinion of this examining psychologist because she found "it inconsistent with other evidence of record including Ms. Kelly's own evaluation notes" (Tr. at 37). The ALJ did not discuss Ms. Kelly's Psychiatric Evaluation of March 2012 in determining what weight to give her opinion.

Additionally, the ALJ gave the opinion of Claimant's treating physician, Dr. Robie, little weight because she found "it is without substantial support from the other evidence of record, including his own treatment notes, which obviously renders it less persuasive" (Tr. at 37). To support the weight given, the ALJ states only that "In February 2012, Dr. Robie opined that the

20

claimant was able to sit for up to one hour and stand for up to one hour in an eight-hour day.  He concluded she could occasionally bend, squat, crawl, climb and reach." (*Id.*)

As for the opinion evidence, the ALJ gave great weight to consultant examinations performed by James Binder, M.D., and Paula Bickham, Ph.D. (Tr. at 36).  In September 2010, Dr. Binder found insufficient evidence to make a determination of Claimant's medical disposition from January 15, 2004, the alleged onset date, to June 30, 2008, Claimant's date last insured (Tr. at 377).  The ALJ stated that Dr. Binder found "that beginning March 29, 2010, the date of the current supplemental security income application the claimant was mildly limited in her activities of daily living and concentration, persistence, and pace; with moderate limitations in social functioning; with no extended episodes of decompensation.  He concluded that the claimant was capable of learning and performing basic work-like tasks" (Tr. at 36).  The ALJ stated that "In January 2011, Paula Bickham, Ph.D., concluded that the claimant was capable of learning and performing repetitive work-like activity with minimal contact with others and was mildly limited in her activities of daily living, with moderate limitations in concentration, persistence, pace and social functioning; with no extended episodes of decompensation" (Tr. at 36-37).

The ALJ stated that "Although these experts did not have an opportunity to examine or treat the claimant, the reports clearly reflect a thorough review of the record and are supportable.  In short, these experts' familiarity with Social Security Administration disability evaluation program and the evidence of record warrants the greatest weight.  That said, the residual functional capacity reflects additional limitations from hearing level evidence not considered in these assessment" (Tr. at 37).

Dr. Binder's examination considered evidence from January 15, 2004, to June 30, 2008, and from March 29, 2010, to September 18, 2010 (Tr. at 377-392).  This examination did not include evidence from June 30, 2008, to March 29, 2010.  Dr. Binder's examination also did not include the Psychiatric Evaluations by Ms. Kelly dated July 2011 and March 2012.  Likewise, Dr. Bickham's examination considered evidence up to January 10, 2011 (Tr. at 473).  Her examination did not include the Psychiatric Evaluations by Ms. Kelly or Dr. Robie's questionnaire.

For DIB purposes, Claimant must establish an entitlement to disability prior to the expiration of her insured status.  Claimant's mental health prior to her date of onset is relevant for DIB purposes.  However, for SSI purposes, Claimant's mental health from her alleged onset date forward is considered.  Therefore, the Court finds that the ALJ erroneously relied upon and gave great weight to the opinions of non-examining physicians regarding impairment severity, which were not based upon a review of the entire record.  Weight given to a medical opinion is directly related to the extent to which an acceptable medical source is familiar with all the information in the case record.  20 C.F.R. § 404.1527(d)(6).  Therefore, the ALJ's holding that the opinions of the state agency consultants are be entitled to great weight is not supported by substantial evidence.

Vocational Expert

The ALJ asked the Vocational Expert (hereinafter VE) at the hearing if  a hypothetical person the Claimant's age who has a limited education and no past relevant work experience could work at all exertional levels (Tr. at 82).  The VE testified that the person could work at the medium exertional level in general cleaning activities and janitorial (Tr. at 82-83).  The VE

testified that the number of jobs would be reduced with the restriction of limited contact with coworkers and supervisors (Tr. at 83).   The ALJ asked the VE if the individual could occasionally interact with coworkers but not work on a team.   The VE testified yes, that additional jobs existed in cleaning positions with the limitation on interaction with coworkers, however, the positions available would be reduced in half because of restrictions.   The ALJ asked the VE if the hypothetical individual were to also be limited to occasional production pace; occasional decision making; occasional judgment; and only occasional changes in the work setting, would that affect the jobs previously provided (Tr. at 83-84).   The VE testified that the limitations would not affect the jobs provided.   The VE testified that no jobs are available in the national economy for the hypothetical individual if the individual is unable to leave the home (Tr. at 85).   The VE testified that an individual could not retain employment if limited to only occasionally being able to perform activities within a schedule, maintain regular attendance and be punctual.   (*Id.*)

Claimant's counsel asked the VE if there would be any jobs for an individual with Claimant's age and education who had chronic crying spells throughout the day (Tr. at 86).   The VE replied there would be no employer who would tolerate such on a daily basis.   Although the ALJ did not include the limitation of crying spells in her hypothetical to the VE, the ALJ's decision stated that Claimant "cried throughout the hearing" (Tr. at 33).   At the hearing, Claimant's husband testified that she has crying spells daily (Tr. at 73).   Claimant testified that she has crying spells daily.   Mr. Vecchio reported Claimant crying during her examination. Ms. Kelly reported Claimant crying during her evaluations.   The ALJ rejected the hypothetical proposed by Claimant's counsel as she held it is not supported by the overall objective credible evidence of record (Tr. at 39).

All of the exhibits introduced into evidence before the ALJ are not contained within the record for the Court to review.  The following exhibits have been removed from the record with the sole explanation that "they did not belong to the claimant:"

- Exhibit 18F: Process Strategies - Comprehensive Psychiatric Evaluation Report and Progress Notes from August 21, 2002, to March 17, 2004 (Tr. at 45, 518).

- Exhibit 19F:  Process Strategies – Office Treatment Records from August 21, 2002, to March 17, 2004 (Tr. at 45, 518).

- Exhibit 20F (pages 1 through 7, 12 through 23, and 26 through 29): Process Strategies – Office Treatment Records from July 21, 2004, to May 6, 2008 (Tr. at 45, 518).

It is unclear whether the exhibits above were removed prior the Appeal Council's determinations.  However, it is unequivocally impossible for the Court to review the record as a whole when exhibits are absent.

"[Judicial] review of a decision of the Commissioner . . . in a disability benefits case is limited to determining whether the Commissioner's decision is supported by substantial evidence on the record as a whole.". *Raney v. Barnhart*, 396 F.3d 1007, 1009 (8th Cir. 2005).   While not required to discuss every piece of evidence, an ALJ should discuss evidence that, if believed, could lead to a finding of disability.  *Barrett v. Barnhart*, 355 F.3d 1065, 1068 (7th Cir. 2004); 20 C.F.R. § 404.1523 (2013); *Golembiewski v. Barnhart*, 322 F.3d 912, 918 (7th Cir. 2003) (per curiam); *Draper v. Barnhart*, 425 F.3d 1127, 1130 (8th Cir. 2005) (Determination of whether susbtantial evidence supports decision in social security disability case requires reviewing court to consider not only evidence in the record that supports Commissioner's determination, but also any evidence that detracts from that conclusion.); *Randall v. Sullivan*, 956 F.2d 105, 109 (5th Cir.

1992) (In reviewing the Social Security Commissioner's denial of Supplemental Security Income (SSI) benefits for a disability, the court may not examine only the evidence favorable to the Commissioner; it must also examine contrary evidence.); *Clifton v. Chater*, 79 F.3d 1007, 1010 (10th Cir. 1996) ("In addition to discussing the evidence supporting his decision in a social security disability benefits case, the ALJ must discuss the uncontroverted evidence he chooses not to rely upon, as well as significantly probative evidence he rejects."). In the present case, the ALJ did not consider the "record as a whole."

The Court finds that the ALJ's determination that Claimant does not suffer a severe mental impairment is not supported by substantial evidence.  The ALJ relied on the opinions of two State agency medical sources, Dr. Binder and Dr. Bickham, neither of whom had the benefit of Psychiatric Evaluations and other evidence from Ms. Kelly and Dr. Robie.  Ms. Kelly's Psychiatric Evaluation was developed after these sources rendered their opinions, and is not mentioned by either Dr. Binder or Dr. Bickham.  The ALJ rejected the opinions of Dr. Robie, Claimant's treating physician, and Ms. Kelly, examining psychiatrist, for the opinions of two nonexamining sources who did not have the benefit of all the evidence of record from Ms. Kelly and Dr. Robie.  Such findings are not supported by substantial evidence and do not comply with the 20 C.F.R. §§ 404.1527(d) and 416.927(d).

Claimant raises additional arguments as to why the ALJ's decision is not supported by substantial evidence.  The Court declines to address these arguments, as they can be addressed on remand.

After a careful consideration of the evidence of record, the Court finds that the Commissioner's decision is not supported by substantial evidence.  Accordingly, by Judgment

Order entered this day, the Plaintiff's Motion for Summary Judgment on the Pleadings is GRANTED to the extent Claimant seeks remand and otherwise DENIED, this matter is REVERSED and REMANDED for further administrative proceedings pursuant to the fourth sentence of 42 U.S.C. § 405(g) and this matter is DISMISSED from the docket of this Court.

The Clerk of this Court is directed to provide copies of this Order to all counsel of record.

Enter:  September 30, 2014

Dwane L. Tinsley
United States Magistrate Judge